ANTHONY'S PIER FOUR, INC., & others *vs.* HBC
ASSOCIATES & others
(and a consolidated case).

Suffolk. September 4, 1991. - December 30, 1991.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Practice, Civil*, Mediation by judge, Findings by judge, Stipulation, Judg-
ment. *Contract*, Performance and breach, Implied covenant of good
faith and fair dealing, Waiver, Damages. *Waiver. Consumer Protection
Act*, Businessman's claim, Unfair act or practice, Damages. *Evidence*,
Relevancy and materiality, Expert opinion, Value. *Value. Damages*,
Breach of contract, Apportionment, Consumer protection case, Loss of
profits.

On appeal following the jury-waived trial of a civil action, there was no
merit to the claim that the proceedings should be vacated for the reason
that the parties, pursuant to a stipulation of counsel, had participated
in pretrial mediation efforts in which the principals of each side met
separately with the judge. [463-464]
A judge's findings of fact at the jury-waived trial of a civil action were the
product of his independent judgment and were entitled to the deference
customarily accorded by an appellate court. [464-465]
On appeal following the jury-waived trial of a civil action, there was no
merit to the contention that the judge's findings and rulings contained
inconsistencies precluding appellate review. [466-468]
At the jury-waived trial of claims arising from a party's alleged breach of
contracts for commercial development of certain real property, the
judge was warranted in concluding that proposed changes in the project
did not threaten inconsistency with the basic development plan so as to
give rise to that party's disapproval rights and that, in the circum-
stances, the purported disapproval of the changes was a material breach
of the contract. [468-470]
A defendant in breach of contract claims was not entitled to contend on
appeal that the plaintiff's postbreach conduct constituted a waiver,
where it did not plead waiver as an affirmative defense and where the
issue was not raised, considered, or passed upon in the trial court. [470-
471]
At the jury-waived trial of claims under contracts for commercial develop-
ment of certain real property, the evidence amply warranted the judge's

conclusion that one party's purported disapproval of certain proposed changes in the project, as a pretext for purposes of forcing financial concessions from the developer, destroyed or injured the developer's right to receive the fruits of the contract and thus violated the implied covenant of good faith and fair dealing. [471-474]

At the jury-waived trial of claims for breach of contract, the judge's extensive findings as to a party's violation of the implied covenant of good faith and fair dealing established, as matter of fact and law, that its actions were unfair and deceptive so as to give rise to liability on a businessman's claim under G. L. c. 93A, the Consumer Protection Act. [474-476]

At the jury-waived trial of claims for breach of contract, the judge acted within his discretion in excluding evidence of certain postbreach events and in excluding rebuttal evidence in support of a party's affirmative case. [476-478]

At the jury-waived trial of claims arising from breach of contracts for commercial development of certain real property, the judge applied the correct measure of expectancy damages. [478-479]

At the jury-waived trial of claims arising from breach of contracts for commercial development of certain real property, there was no error in the judge's admission of testimony regarding comparably valued parcels. [479-481]

In the damages phase of a jury-waived civil trial, the judge properly excluded proffered expert testimony that would have been cumulative or would have relitigated issues of liability. [481-482]

A judge's award of damages, after an extensive jury-waived trial, was supported by the evidence and was not shown to be clearly erroneous. [482-483]

In assessing damages following the jury-waived trial of a civil action, the judge was free to discount the expert witnesses' valuations of the parties' respective interests under commercial real estate development contracts. [483-484]

The prevailing party on claims for breach of contract was not entitled to recover its postbreach expenditures which it did not show it had incurred in a reasonable effort to mitigate its losses. [484-485]

In the damages phase of the jury-waived trial of claims for breach of real estate development contracts, the judge was warranted in finding four related corporations jointly and severally liable for a share of the fees for the work of environmental consultants, and this conclusion did not conflict with a stipulation of the parties. [485-487]

On remand of a civil action, the judge was to consider issues concerning collection of the judgment. [487-488]

CIVIL ACTIONS commenced in the Superior Court Department on January 19, 1988.

The cases were consolidated for trial and were heard by *Herbert Abrams*, J.

The Supreme Judicial Court granted requests for direct appellate review.

*Joel A. Kozol* (*Lee H. Kozol* with him) for the plaintiff.

*Gael Mahony* (*John A. D. Gilmore, Frances S. Cohen, Martha Born, Anita S. Lichtblau, William B. Forbush, & Timothy B. Tomasi* with him) for HBC Associates & others.

*Francis C. Lynch*, for Channel Parking & Development, Inc., & others, was present but did not argue.

ABRAMS, J. This case arises from two agreements (agreements), dated August 1, 1983, between Anthony's Pier Four, Inc. (Anthony's),[1] and HBC Associates (HBC),[2] providing for HBC's acquisition and development of Fan Pier.[3]

The development was halted in May, 1987, as a result of a dispute between Anthony's and HBC. In January, 1988, Anthony's sued HBC. On the same day, HBC brought suit against Anthony's. Each claimed contract violations against the other (as well as other claims). The cases were consolidated for trial. After a jury-waived trial, the judge ruled that Anthony's violated the express terms of the agreements and the implied covenant of good faith and fair dealing. The judge rejected HBC's claim that Anthony's was liable to HBC under G. L. c. 93A (1990 ed.). Thereafter, there was a trial on damages. The judge ruled in favor of HBC in the

[1]Anthony's is owned and operated by Anthony Athanas (Athanas) and members of his immediate family. Pier Four, Inc., Anthony's Hawthorne, Inc., and Boston Mariner, Inc., also are family entities.

[2]HBC was a joint venture of two corporations, HT-Boston, Inc., and Carpenter Properties, Inc. In March, 1987, Carpenter Properties was succeeded by Carpenter Fan Pier Associates Limited Partnership with FP, Inc., as its sole general partner.

[3]One, the development agreement, gives HBC the right to develop the Fan Pier site, to purchase a portion of the premises on which residential units were to be built, and to lease portions on which nonresidential units were to be built. The other, the hotel ground lease, leases part of the site to HBC for the development and operation of a hotel.

sum of $42.6 million, plus postbreach expenses incurred by HBC and monies owed by Anthony's and others for the cost of joint development consultants.[4] Both parties appeal.

Anthony's argues that we should (1) vacate the proceedings; (2) not accord the judge's findings and rulings any deference; (3) conclude that the inconsistencies in the judge's findings and rulings preclude appellate review; (4) reject the judge's determination that there was a material breach of the express contract; (5) reject the judge's conclusion that Anthony's had violated the implied covenant of good faith and fair dealing; (6) affirm the judge's holding that Anthony's is not liable to HBC under G. L. c. 93A; (7) reverse the determination on liability for evidentiary errors; (8) determine that the judge erred in using an improper measure of damages, making erroneous evidentiary rulings on damages, committing a mathematical error, and awarding postbreach expenditures; (9) determine that the judge erred in holding a number of Athanas family ventures jointly and severally liable for environmental consultants' fees; and (10) reverse the judge's partial final judgment and enter a judgment for Anthony's. HBC cross-appealed the denial of its claims for violation of G. L. c. 93A. Both sides filed applications for direct appellate review. We allowed the applications. We affirm the award of expectancy damages, postbreach rent and taxes paid by HBC to Anthony's, and consultants' fees. We set aside the award of postbreach expenditures not attributable to rent or taxes. We reverse so much of the judgment as denied G. L. c. 93A damages to HBC. We remand the matter to the trial judge for further proceedings consistent with this opinion.

The judge found the following facts. Fan Pier is a parcel (approximately eighteen and one half acres) of undeveloped land located in South Boston. Fan Pier abuts Pier Four to the east. HBC's development plans for Fan Pier included a

---

[4]The judge entered a partial final judgment against Anthony's, reserving ruling on an issue regarding how that judgment might be satisfied. See note 18 and section 10, *infra.*

high-rise hotel, office towers, luxury condominiums, and a marina. At the time that HBC was developing Fan Pier, Anthony's was developing Pier Four. Anthony's was planning a smaller but similar development on Pier Four, which was also to include a hotel, condominiums, and office and retail space.

The agreements between Anthony's and HBC to develop the Fan Pier site, among other things, confer on Anthony's limited rights of approval of changes in HBC's basic development plan.[5] Specifically, the 1983 development agreement provides that changes in the development team and the basic development plan shall be subject to the approval of Athanas. In the agreement, "Athanas acknowledges that the [b]asic [d]evelopment [p]lan was flexible and tentative since it was prepared before extensive engineering studies of the property were made and before HBC commenced the public process of obtaining permits and approvals. Therefore, Athanas's approval of a change in the [b]asic [d]evelopment [p]lan will be required only if such change would have a materially adverse effect on the factors set forth in (i), (ii), or (iii) below [the review conditions]." The factors are: "(i) ensuring that the changes are consistent with the [b]asic [d]evelopment [p]lan as previously approved; (ii) ensuring that a hotel is located reasonably close to [Anthony's] remaining property to the extent consistent with its being a waterfront hotel, it being understood that HBC shall not be required to construct the hotel closer than Pier 2; and (iii)

---

[5]The basic development plan is defined in the contract as "the preliminary site plans and preliminary massing studies for such development, showing alternative approaches to such development." The basic development plan was a general, conceptual document. It did not provide details about such specifics as internal or external designs of buildings or the flow of traffic but rather was intended to convey to Athanas basic information about the development of the site (e.g., uses).

The basic development plan was submitted to and approved by Anthony's in July, 1981, with the caveat that "this approval does not apply to any off-site improvements shown on the [p]lan, and because the [p]lan does not show in sufficient detail the allocation of the property between [r]esidential and [c]ommercial, this approval does not cover that aspect of the [p]lan."

ensuring that the design of such hotel integrates with and is not detrimental to [Anthony's] property adjacent to the [Fan Pier site] . . . ."

The agreements also stipulate that "HBC shall submit a reasonable explanation" of any changes in the basic development plan. Anthony's covenants that "approval shall not be unreasonably withheld or delayed and shall be deemed given if Athanas has failed to respond with specified objections within fourteen days after receipt by Athanas of HBC's request and the requisite information."

Anthony's and HBC's development efforts were cooperative, with shared consultants, coordinated planning, and joint filings for public approvals. Their goal was to develop projects which would be fully integrated and compatible with each other. Representatives of Anthony's, including Athanas himself, appeared along with HBC representatives before numerous groups — from public agencies to the Boston Globe newspaper — to promote the Fan Pier and Pier Four projects.[6] The Fan Pier project director met with Athanas regularly in order to keep him informed of HBC's progress and to review with him decisions HBC faced as it proceeded.[7]

In 1984, HBC changed architects for the Fan Pier project. Athanas and his sons travelled to Chicago with HBC representatives to interview the new architectural firm (the second architects). The second architects began work on a new master plan for Fan Pier that fall. They met with Anthony's architects to coordinate the development of the Fan Pier and Pier Four master plans.[8] The second architects presented

---

[6]At these meetings, both HBC and Anthony's presented drawings and scale models of the projects which illustrated the integration and compatibility of the Fan Pier and Pier Four projects. Athanas publicly expressed his support and enthusiasm for the Fan Pier project at these meetings.

[7]During discussions with the HBC project director, Athanas said that, although he did not intend to start construction of Pier Four until after construction had begun on Fan Pier, he wanted the securing of basic permits for the two projects to proceed simultaneously.

[8]Later, HBC hired different architects to design some of the individual Fan Pier buildings. HBC's main architectural team, the second architects,

their preliminary master plan to Athanas at two meetings in November, 1984.

In March, 1985, Athanas convened a meeting with the Fan Pier project director to express his concern that the Fan Pier project was moving ahead of the Pier Four project, and reiterated his desire to have the two projects proceed in tandem through the government permitting process. In response, the Fan Pier project director advised Athanas to hire a development adviser in order to ensure that the Pier Four development proceeded apace and in tandem with the Fan Pier project. A few months later, Anthony's hired such an adviser.

Through the spring and summer of 1985, the second architects worked on developing a "lesser scale alternative," a refinement of their first development scheme. In the fall of 1985, HBC learned that Anthony's had, like HBC, dismissed its first architect and retained a new architectural firm. The replacement firm was instructed to prepare a new master plan for the Pier Four development that would integrate with the Fan Pier plan. In late 1985 and early 1986, architects for HBC and Anthony's made a series of joint presentations of the Fan Pier and Pier Four plans to public and government agencies.

In January, 1986, just before the filing for the first round of applications for governmental approvals, Athanas, his development adviser, and counsel met with HBC, its counsel, and project manager to review the Fan Pier plans in order to ensure that the plans for which public approval would be sought had the approval of Anthony's under the agreement. At the meeting, an HBC architect presented the design features of the plan, and other HBC representatives presented various development aspects of the plan, including the distribution of uses and the vehicular parking provisions for each use. HBC representatives also fielded questions about the plans. At another meeting held later that month, Anthony's

prepared guidelines for these architects in order to ensure that their individual designs conformed to the requirements of the master plan.

counsel said that Athanas approved of the lesser scale alternative which had been discussed at the meeting.[9]

In 1986, HBC prepared a video to show to potential Fan Pier development investors. The video included an interview with Athanas, in which he praised the second architects' design and its integration with the Pier Four design. That same year, Anthony's development adviser printed an informational brochure about the Pier Four project. The brochure, intended to enlist support for the project, was shown to potential investors and governmental and community groups. Athanas reviewed the brochure. The brochure spoke glowingly of the Fan Pier project and its integration with the Pier Four project.[10]

In early 1987, Anthony's counsel, responding to HBC's request for written approval of HBC's revised development team and basic development plan, drafted a letter to HBC saying, "We see very little problem other than our concern of allocation between residential and commercial, which we reserved on approval of the original [b]asic [d]evelopment [p]lan."

In the fall of 1986, Athanas and his development adviser learned that another harborfront deal had been far more lucrative for the landlord than the Fan Pier deal promised to be for Anthony's. They began to grumble about the price terms of the deal with HBC and to pressure HBC to increase the compensation to Anthony's. Initially, their demands focused on a claim that HBC was only entitled to purchase the area beneath the footprints[11] of the residential buildings at

---

[9]Anthony's counsel added only one caveat to this approval: Athanas requested further information regarding the design of the pedestrian bridge at the project's easternmost point.

[10]In the summer of 1987, after Anthony's had formally disapproved of the project, Anthony's development adviser ran a second printing of the brochure, which continued to describe in glowing terms those aspects of the Fan Pier of which Anthony's purported to disapprove.

[11]"Footprint" refers to the dimensions of a building at its outermost definition.

ground level.[12] This claim threatened to frustrate HBC's plan to build the underground parking, which HBC viewed as necessary to the development's ability to attract tenants.[13] Anthony's development adviser said that, even though HBC was not entitled to purchase more land, Anthony's would be willing to sell HBC the land lying outside the footprints for a higher price than that provided for land purchases in the original agreements. While they did raise a few other financial issues, neither Anthony's nor its development adviser raised any concerns relating to the design features of the Fan Pier development at that time.

At a December meeting between the parties, Anthony's escalated its demands. On December 30, one of Anthony's attorneys called one of HBC's attorneys with more demands, stating that Athanas "was very unhappy with the deal that he had made back in 1983." At a January 23 meeting convened to discuss the outstanding issues, Anthony's did not express any objections to any design feature of the Fan Pier plans. At a mid-February meeting, Anthony's representatives complained about the lease that HBC had negotiated with a law firm that was to be the anchor tenant in the Fan Pier commercial real estate. At least as early as February 17, 1987, Anthony's retained a new law firm. They were retained, from the outset, to assist Anthony's in its efforts to alter the terms of the original agreements.

On February 25, Anthony's development adviser wrote a "ground lease issues" list in which she identified the "Goal"

---

[12]The development agreement states, in pertinent part, that HBC has the right to purchase "the portion of the [r]esidential [d]evelopment necessary or desirable for the building footprints (plus areas and easements directly and exclusively related thereto)." The development agreement also provides that "[i]f HBC purchases the [r]esidential [d]evelopment . . . Athanas shall execute and deliver to HBC a quit claim deed in the form attached hereto as Exhibit C." The form of deed expressly states that parking facilities are included.

[13]HBC had presented a plan to Athanas and his development adviser in late 1985 and early 1986 which included the underground garage area (extending beyond the footprints) HBC intended to purchase. No objection was raised at that time.

as obtaining "market value for everything." She defined market value as "$4 million per acre, or $40 per [Floor/Area Ratio] office square foot" (far more than HBC was obligated to pay under the agreements). On the same day she drafted what she referred to as the "big red flag letter," so named because it was intended to attract attention. The main points of that letter were included in a letter sent the next day to HBC by Anthony's new attorneys. The letter identified as the "most serious questions" Anthony's compensation under the agreement and the sale of land to HBC in connection with the residential real estate. After receiving this letter, HBC representatives met with Athanas to discuss the issue. At that meeting, Athanas said, among other things, "[He] made a lousy deal, and [he] need[ed] more money;" the "whole list of issues was really only about money and that he had to get more money to be satisfied;" and that "his kids were only going to get a lousy $750,000 a year out of [the] arrangement." At a meeting the next day, Athanas declared, "We have no deal."

On March 2, 1987, HBC responded to Anthony's letter of February 26 by communicating its desire "to undertake immediately a good faith effort to discuss [Anthony's] concerns." At a March 4 meeting, Anthony's development adviser said that certain "physical, economic and timing changes," which, she asserted, had occurred since the agreements had been signed in 1983, "warranted" Pier Four's position that HBC had to "renegotiate" its terms. Athanas again complained of being undercompensated under the agreements. Anthony's representatives still had not objected to any features of the Fan Pier design plans as of this meeting.

On March 18, Anthony's attorney wrote to HBC's attorney asking him to "clarify" the "question of approval by [his] client of the basic development plan," stating that his "records [were] not clear on this point, so that [he was] unable to conclude whether or not the approval was given and, if it has, of what specific plan." On March 30, the attorney followed up his request with a telephone call, stating that he

had been unable to find any written approval of the Fan Pier plan in the file that Anthony's former attorneys had turned over to him. HBC's attorney responded by saying that there had been no formal, written approval, but that Athanas, his family members, and their representatives had expressed their approval of the project throughout the process and on more than one public occasion. The HBC lawyer also expressed his surprise that Anthony's lawyer had questions about approval of the plans at such a late stage.

Three days later, Anthony's attorney wrote to the HBC attorney: "As you know, on what we understand is the existing record, our position is that there has been no approval of the current development plan, which is, among other things, inconsistent with my clients' economic expectations."

This was the first time that an Anthony's representative had indicated that Anthony's did not approve of the Fan Pier development plans. In its May 18 response, HBC stated that it believed that no approval by Athanas of HBC's development plan (as it existed at that time) was required, because none of the changes in that plan materially, adversely affected the "review conditions." Nevertheless, HBC asked that Anthony's, in light of its letter, formally approve the current Fan Pier development plans. Only with such approval, HBC felt, could it continue to seek investment partners and government permits and approvals.

Ten days later, having received no response from Anthony's, one of the HBC principals arranged to meet with Athanas. At that meeting Athanas said, "This is not about approval of the plan. This is about money. After you get the letter, let's sit down and we will talk about it." On May 29, Anthony's officially notified HBC by letter that its development plans for Fan Pier had been disapproved. The letter was signed by Athanas and said, "My view is that such approval is needed, that it has never been requested until now, and that it has never been given." In his letter, Athanas asserted that HBC had never provided him with an explanation

of changes in the plan, and that he therefore was unable "to evaluate the effect of the change on [his] interests."[14]

When HBC representatives called Athanas a few days later, Athanas told them that HBC had a "moral obligation" to pay him more, and that they "had plenty of room in [their] deal to pay [him] more money. That is why the letter was sent." When an HBC representative called Athanas's son, Anthony Athanas, Jr., to see if the deadlock could be broken, Athanas, Jr., responded, "I'd rather look out of my window on nothing than on a lousy deal."

In response to Anthony's disapproval of the Fan Pier plans, HBC suspended its efforts to secure approval from various governmental agencies necessary to complete the project and stopped work on the project. It continued, however, to pay rent and property taxes and spent over two million dollars on consulting fees. It did not make public Anthony's disapproval, hoping to resolve matters and proceed with the project.

On January 19, 1988, HBC and Anthony's brought suit against each other.[15] HBC sought declaratory relief and damages for breach of contract and breach of the implied covenant of good faith and fair dealing, as well as restitution, specific performance and G. L. c. 93A damages. Anthony's

---

[14]The specific features Athanas complained of were: vehicular and pedestrian access, the eastern elevation of one of the buildings, the hotel truck entrance, the corner of the hotel closest to the connection to Pier Four, and the design for the hotel tower. This was the first time Athanas had voiced these complaints to HBC.

[15]On the same day, Anthony's conveyed record title in Fan Pier to the Fan Yards Nominee Trust. Athanas's four sons are the trustees of the Fan Yards Nominee Trust. Channel Parking & Development, Inc., is general partner of the Fan Yards Partnership. Boston Mariner is a company incorporated in 1985 to advise the Athanas companies and Athanas family in matters relating to the Pier Four and Fan Pier projects. Pier Four, Inc., is another Athanas family entity. At the time that HBC and Anthony's entered into the agreements, Pier Four, Inc., owned Pier Four. Later, Pier Four, Inc., was merged into Anthony's Hawthorne, Inc. Anthony's Hawthorne, Inc., also owned and controlled by the Athanas family, owns Pier Four. These parties (Fan Yards parties) filed briefs addressing only issues relevant to the January 19, 1988, conveyance. See sections 9 and 10, *infra*.

sought declaratory relief and damages for the breach by HBC of its contractual duty to proceed expeditiously with the development,[16] and of its covenant of good faith and fair dealing, as well as G. L. c. 93A damages. The cases were consolidated for trial. The trial was bifurcated into phases on liability and damages.

In the phase I (liability) trial, the judge ruled that Anthony's purported disapproval of HBC's development plan was a breach of both the express terms of the agreements and the implied covenant of good faith and fair dealing. The judge found that, from August 1, 1983, when the hotel ground lease was executed, until May 29, 1987, when Anthony's sent the disapproval letter, HBC had proceeded expeditiously in normal sequence for projects of this type. The judge denied HBC's claim for violation of G. L. c. 93A. The judge further ruled that HBC had not violated its implied covenant of good faith and fair dealing.

At the conclusion of the phase II (damages) trial, the judge awarded HBC expectancy damages for breach of the agreements (and, in the alternative, reliance damages), plus additional amounts for reasonable postbreach expenses incurred by HBC and for money owed to HBC by Anthony's and other Athanas entities for the cost of joint development consultants.

1. *Request to vacate the proceedings.* During the early part of the phase I (liability) trial, the judge met separately with the principals of each side and their counsel in an effort to help the parties reach a settlement. The judge asked counsel to sign a stipulation. The stipulation states, in pertinent part, that "persons present during the mediation session who have been, are or may be witnesses in the case will not speak

---

[16]HBC "covenant[ed with Anthony's] to proceed expeditiously with the [h]otel [d]evelopment (subject only to obtaining the requisite [p]ermits and [a]pprovals) including seeking financing and [p]ermits and [a]pprovals in normal sequence for projects of this type." The first occasion on which Anthony's complained of HBC's alleged failure to "proceed expeditiously" was in an amended complaint submitted after it had received HBC's complaint.

to the Court concerning the events about which they have testified or may testify" and that "no claims for appellate or other relief will be made based on the process itself, and . . . no claim will be made that any finding of the Court is based on or affected by information the Court may receive during the mediation process." The judge approved the stipulation.[17] Anthony's asserts that "public policy demands the condemnation of the practice, regardless of any consent or waiver, and that a judgment following such practice must be held to be void." The short answer to this claim is that it is untimely, unfounded, and unmeritorious. In essence, Anthony's is claiming that litigants may "anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them for a cause which was well known to them before or during the trial." *Krattenstein* v. *G. Fox & Co.*, 155 Conn. 609, 616 (1965). See *Timm* v. *Timm*, 195 Conn. 202, 203-205 (1985). No attorney and no litigant may use a "heads I win, tails you lose" strategy with a judge.

"The judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Franks* v. *Nimmo*, 796 F.2d 1230, 1234-1235 (10th Cir. 1986). See *Polaroid Corp.* v. *Eastman Kodak Co.*, 867 F.2d 1415, 1420 (1st Cir.), cert. denied, 490 U.S. 1047 (1989) ("the risk of injustice to the parties weights far more heavily on [HBC's] side of the scales; . . . and the public's confidence in the judicial process . . . would be more likely to be undermined if the law were to countenance a sundering of the result [almost four years] later on grounds other than the merits").

2. *Deference to the judge's factual findings.* Anthony's relies almost exclusively on *Cormier* v. *Carty*, 381 Mass. 234 (1980), in arguing that we should not accord the judge's

---

[17]Anthony's does not make a specific claim of prejudice; rather, it claims that the mediation was per se error. Anthony's says, "What effect these ex parte conferences may have had on the judge is not ascertainable."

findings of fact the customary deference. In *Cormier*, this court held that we would apply "stricter scrutiny" to findings of a judge "which fail to evidence 'a badge of personal analysis.' " *Cormier, supra* at 237, quoting *In re Las Colinas, Inc.*, 426 F.2d 1005, 1010 (1st Cir. 1970). At the same time, however, we noted that "the 'clearly erroneous' standard of review specified by [Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974),] is not displaced." *Cormier, supra* at 237. See *Commonwealth v. Hawkesworth*, 405 Mass. 664, 670 (1989); *First Pa. Mortgage Trust v. Dorchester Sav. Bank*, 395 Mass. 614, 622 n.12 (1985). Thus, even in the event of verbatim adoption of a submission of counsel, an appellate court "carefully scrutinizes the record, but does not change the standard of review." *Hawkesworth, supra* at 669 n.5, citing *United States v. Marine Bancorporation*, 418 U.S. 602, 615 n.13 (1974).

The record indicates that the judge so revised HBC's proposed findings and conclusions "that it is clear that the findings are the product of his independent judgment." *Cormier, supra* at 238, quoting *Markell v. Sidney B. Pfeifer Found., Inc.*, 9 Mass. App. Ct. 412, 418 (1980). Contrary to Anthony's claim, the judge did not reproduce HBC's proposed findings and conclusions verbatim. Although he adopted many of them, the judge also rejected a number of HBC's proposed findings and conclusions. In addition, the judge deleted specific language from some of HBC's submissions that he did adopt, incorporated some of Anthony's proposed findings, and drafted findings and conclusions of his own.[18] Anthony's claim on this issue is without merit.

---

[18] A review of the trial transcript confirms that the judge was engaged in the proceedings and in command of the issues. Anthony's accuses the judge, among other things, of "abdicating his judicial responsibility"; his performance, Anthony's says, "mocks the deliberative process." Anthony's accusations are unfounded and unsupported by the record. In a case that Anthony's itself describes as "bitterly contested . . . with an enormous record," the judge, working with very limited resources, disposed of complex litigation in just over two years. Anthony's requested that the case be expedited, and the judge did so. The case was filed on January 19, 1988. The phase I memorandum of decision, findings of fact, rulings of law, and or-

3. *Internal consistency of findings of fact and conclusions of law.* Anthony's directs this court's attention to a number of the judge's findings and conclusions that it alleges are internally inconsistent. From these purported inconsistencies, Anthony's argues that the judge's findings and conclusions fail to reflect the basis of his decision and therefore preclude appellate review. This claim is without merit.[19] Most of the alleged inconsistencies Anthony's cites do not arise from judicial error but, rather, are the product of Anthony's disagreement with the judge's findings of fact, and his resulting interpretation of the agreements.[20]

As an example of the alleged inconsistencies between the judge's rulings of law and his underlying findings of fact,

---

der was entered on April 14, 1989. The phase II memorandum of decision, findings of fact and rulings of law was entered on January 8, 1990. The judgment, memorandum of decision and order, and partial final judgment were entered on February 22, 1990.

[19]We conclude, *infra*, that the judge's ruling that Anthony's violated the implied covenant of good faith and fair dealing cannot be squared with his denial of damages under G. L. c. 93A to HBC. While this is a substantial inconsistency, it by no means renders the judge's findings and rulings unreviewable.

[20]In addition to the conflict between the judge's rulings on the implied covenant of good faith and fair dealing and G. L. c. 93A (see note 19, *supra*, and section 6, *infra*), there are a few inconsequential inconsistencies in the judge's findings. The argument, however, that these minor oversights fatally taint a record compiled over seventy-nine days of trial including over one thousand findings of fact and thirty-five rulings of law, together occupying 445 pages, may be characterized most charitably as frivolous. For example, in his first ruling of law on liability, the judge said that "any changes between HBC's BRA [m]aster [p]lan . . . and the [b]asic [d]evelopment [p]lan are changes within the meaning of the 1983 [d]evelopment [a]greement." The judge prefaced his second ruling of law by saying, "To the extent that any changes between HBC's current [m]aster [p]lan . . . and the [b]asic [d]evelopment [p]lan . . . are changes within the meaning of the [d]evelopment [a]greement. . . ." Anthony's argues that these two rulings are inconsistent. There is no substantial inconsistency. Similarly, in his second ruling of law on liability, the judge first concluded that the changes at issue did not have "an effect" on the review conditions and second ruled that the changes did not have a "materially adverse effect" on them. Of course, if the changes had no effect on the review conditions, they could not have had a materially adverse effect on them.

Anthony's points to the judge's ruling that "any changes between HBC's BRA · [Boston Redevelopment Authority] [m]aster [p]lan [a version of the second architects' master plan revised by the BRA and the plan in effect at the time of the breach] . . . and the [b]asic [d]evelopment [p]lan are changes within the meaning of the 1983 [d]evelopment [a]greement." This ruling, Anthony's contends, is inconsistent with finding 546, in which the judge found that the same plan "is simply another 'interpretation of the narrative plan and its fundamental goals,' and as such is entirely consistent with the Basic Development Plan and *a fortiori* does not materially and adversely affect the three [r]eview [c]onditions in the [1983] [d]evelopment [a]greement."

The judge determined that differences between HBC's BRA master plan and the basic development plan are "changes" within the meaning of the 1983 development agreement, but that not all differences or "changes" between the two plans trigger Anthony's disapproval rights because not all changes materially and adversely affect the three review conditions.[21] We conclude that there is no inconsistency.

Anthony's similarly argues that the judge's ruling that HBC's BRA master plan did not require Anthony's approval was inconsistent with his judgment for HBC. Anthony's argues, as it did at trial, that withholding approval that was not required cannot be a violation of the agreement. This assumes that, under the contract, Anthony's was required only to approve those changes that it might rightfully disapprove. The judge ruled, however, that the agreement provided that, where HBC sought Anthony's approval for a change, Anthony's was required to give its approval unless it rightfully could withhold it. The approval was needed to obtain both financing and needed governmental approvals and permits. The judge ruled that Anthony's failure to approve the change was therefore a violation of both the express agreement and the implied covenant of good faith and fair dealing. The purported inconsistency thus results not from judi-

---

[21]The review conditions appear in the text at 455, *supra*.

cial error but from Anthony's disagreement with the judge's findings of fact and conclusions of law.

Finally, Anthony's argues that the judge's ruling that the BRA master plan did not require Anthony's approval renders superfluous the judge's findings that Anthony's in fact publicly approved the plan. This alleged inconsistency between the rulings of law and the findings of fact is based entirely on Anthony's interpretation of the agreements, which the judge rejected. As discussed above, Anthony's maintains that its disapproval of the BRA Master Plan could not be a breach of contract because its approval was not required. The judge found, however, that Anthony's already had publicly approved the plan. These findings form part of the factual basis for the judge's conclusion that Anthony's purported disapproval letter of May 29, 1987, was a violation of the express agreement.

4. *Violation of the express agreement.* Under the 1983 agreements, Anthony's had the right to disapprove changes in the basic development plan only to the extent that such changes had "materially adverse effect[s]" on one of the review conditions.[22] See note 21, *supra.* The judge ruled that the changes embodied in the BRA master plan did not have a "materially adverse effect" on the review conditions. Anthony's, therefore, had no right to disapprove them. The judge further ruled that Anthony's approval of the BRA master plan had been "unreasonably withheld" in violation of its contractual duty.

Anthony's disputes the trial judge's conclusion that the changes embodied in the BRA master plan had no "materially adverse effect" on the review conditions. Anthony's claims that by replacing the first architect's master plan with the BRA master plan, HBC scrapped the basic development plan and substituted another, quite different blueprint for de-

---

[22]The review conditions were drafted so as to ensure that any subsequent changes would be consistent with the basic development plan, that a waterfront hotel would be located as near as possible to Athanas's remaining property, and that the design of such a hotel was consistent with that of the adjacent Pier 4 development.

velopment. Anthony's maintains that this action clearly was inconsistent with the basic development plan — as it replaced that plan with another. Anthony's claims that it therefore had a right under the contract to disapprove the BRA development plan unless HBC provided it with a reasonable explanation of the changes.[23] Because HBC failed to submit such an explanation, Anthony's contends, Anthony's disapproval of the BRA master plan was not a violation of the agreement.

At root, this claim is grounded on Anthony's contention that the original master plan was the basic development plan.[24] The judge, however, expressly rejected that contention. The judge found that although the original master plan resembled the basic development plan, the two differed from one another on the very details that Anthony's purported to disapprove in the later BRA master plan. The substitution of the BRA master plan for the original master plan was not a change that, in itself, threatened inconsistency with the basic development plan, and therefore it did not trigger Anthony's disapproval rights.

Anthony's next attack on the judge's conclusions is that if, as the judge ruled, HBC was not required to seek Anthony's

[23]Neither party disputes that HBC did not send Anthony's an explanation of the changes embodied in the BRA master plan in response to Anthony's letter of May 29, 1987. The judge found, however, that HBC had extensively explained the BRA master plan to Anthony's and, indeed, that Anthony's and its officers and employees had repeatedly approved the plan in public and private statements.

[24]Anthony's also argues that the judge drained its disapproval rights of all meaning when he held that the "[b]asic [d]evelopment [p]lan is a general narrative and illustrative statement of development concepts, including 'preliminary site plans and preliminary massing studies . . . showing alternative approaches' " to development. According to Anthony's, the basic development plan comprised only the site plans and preliminary massing studies and not the narrative portion of the booklet. In addition to its facial inconsistency with Anthony's contention that the first architects' original master plan was the basic development plan, this argument merely quarrels with the facts found by the judge. The judge's finding that the basic development plan comprised a narrative interpretation of the site plans and massing studies as well as the plans and studies themselves is supported by the record.

approval of the BRA master plan, then Anthony's withhold-
ing of its approval could not constitute a breach of the agree-
ment. The judge, however, ruled that Anthony's disapproval
was a breach of contract. The judge read the contract as re-
quiring HBC to submit a plan for Anthony's approval if, and
only if, the changes therein had a "materially adverse effect"
on the review conditions — that is, if the plan triggered
Anthony's right to disapprove. The judge further interpreted
the agreements, however, to require Anthony's approval if
Anthony's was presented with a plan that HBC need not
have submitted for approval. Anthony's approval was critical
for the project's financiers and to obtain needed government
approvals and permits. The judge's ruling that, by failing to
give its approval, Anthony's violated the express terms of the
agreement was correct. There was no error.

Anthony's contends that, even if it violated the agreement,
its breach was not material, and HBC therefore was not jus-
tified in renouncing the contract. Anthony's attempts to min-
imize the effect of the May 29, 1987, letter by arguing that,
given the proportions of the deal, the letter was too small and
ambiguous a dispute to constitute a material breach. We do
not agree.

The judge found that, but for the letter, HBC would have
begun construction of the hotel by the outside closing date.
The letter thus had a profound effect on the transaction. As
the judge's finding indicates, HBC was unable, as a practical
matter, to perform its obligations under the agreements after
Anthony's sent the letter. The breach thus compromised "an
essential and inducing feature of the contract," the duty of
HBC to begin construction of the hotel by the outside closing
date. *Bucholz* v. *Green Bros.*, 272 Mass. 49, 52 (1930). See
*Petrangelo* v. *Pollard*, 356 Mass. 696, 700-701 (1970).

Anthony's further contends that HBC's postbreach con-
duct constitutes a waiver of its claim for breach. After the
breach, HBC continued to pay monthly rent and real estate
taxes, requested a tolling of the outside closing date, gave
notices of closing on the residential, marina, and nonhotel
commercial parcels, and continued to pay architects' and

consultants' fees. From these facts, Anthony's argues that HBC waived its right to renounce the contract based on Anthony's breach. "The short answer to this contention is that [Anthony's] did not plead waiver as an affirmative defense and the issue was not raised, considered, nor passed upon in the [trial] court. . . . The defense cannot be raised in this court for the first time." (Citations omitted.) *Nakdimen* v. *Baker*, 111 F.2d 778, 782 (8th Cir.), cert. denied, 311 U.S. 665 (1940). See *Atlas Assurance Co.* v. *Standard Brick & Tile Corp.*, 264 F.2d 440, 443 (7th Cir. 1959). See *Middlesex & Boston Ry. Co.* v. *Aldermen of Newton*, 371 Mass. 849, 859 (1977) ("The failure to comply with this rule [Mass. R. Civ. P. 8 (c), 365 Mass. 750 (1964)] is, without more, sufficient reason for holding that the defenses of waiver and estoppel are not now open to the defendants"). "Generally, a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case." 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1278, at 477 (2d ed. 1990). There is no reason not to follow the general rule here.[25]

5. *Violation of the implied covenant of good faith and fair dealing.* "Every contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting *Kerrigan* v. *Boston*, 361 Mass. 24, 33 (1972). See *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 152-153 (1930). The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of

---

[25]Moreover, Anthony's trial strategy was to claim that HBC could not meet the outside closing date. In light of Anthony's trial strategy, we would not reach the waiver argument even if waiver had been pleaded. "The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review of the acts of the trial judge." *Kagan* v. *Levenson*, 334 Mass. 100, 106 (1956), quoting *Santa Maria* v. *Trotto*, 297 Mass. 442, 447 (1937). *Commonwealth* v. *Phoenix*, 409 Mass. 408, 415 n.4 (1991). *Commonwealth* v. *Roberts*, 407 Mass. 731, 737 (1990). *Commonwealth* v. *George*, 406 Mass. 635, 636 n.4 (1990). *Matter of Saab*, 406 Mass. 315, 322 n.10 (1989).

the contract . . . ." *Drucker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976), quoting *Uproar Co.* v. *National Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936). The judge concluded that Anthony's purported disapproval of the BRA master plan destroyed or injured HBC's right to receive the fruits of the contract and thus violated the implied covenant. This ruling was amply supported by the evidence in the record.

The judge found that at a meeting in October, 1986, Anthony's development adviser warned that Anthony's belief that the "agreements 'did not represent current market value [of the Fan Pier land and development rights]' would affect how [Anthony's] 'dealt' with HBC." On February 26, 1987, the judge found, Athanas met with representatives of HBC. At that meeting, Athanas explained that he had "made a lousy deal . . . and . . . need[ed] more money." He further noted that a list of issues that his representatives had previously raised with HBC "was really only about money and that [Athanas] had to get more money to be satisfied." Athanas opined that the law firm that assisted him in drafting the agreements "had done a lousy job and that [Athanas's] kids were only going to get a lousy $750,000 a year out of [the] arrangement." The judge also found that Anthony's disapproval of the BRA master plan was, by Athanas's admission of May 28, 1987, "not about approval of the plan" but rather "about money."

The judge found that after sending the letter, Athanas explained to HBC's representatives that he wanted "more money" than the agreements provided. "That is why," Athanas explained, "the [May 29] letter was sent." The judge further found that although Anthony's purported to disapprove the BRA master plan, Athanas admitted: "I'm not really disapproving the project. I want to get more money." Finally, the judge found that in June, 1987, Athanas's son told HBC that he would "rather look out of [his] window on nothing than on a lousy deal."

The judge found that a number of the positions and actions taken by Anthony's, culminating with the purported

disapproval of the BRA master plan, were designed to "forc[e] financial concessions from HBC." Anthony's approval was crucial to HBC's efforts to obtain financial backing as well as governmental permits and approvals. Knowing that it thus could apply pressure on HBC, Anthony's withheld its approval in an attempt to force HBC to sweeten the deal. Anthony's use of a discretionary right under the agreements as a pretext justifies the judge's ruling that Anthony's breached the covenant of good faith and fair dealing. See *Northern Heel Corp.* v. *Compo Indus., Inc.*, 851 F.2d 456, 471 (1st Cir. 1988) (applying Massachusetts law, court found violation of implied covenant of good faith and fair dealing in repudiation that was "but a tool engineered to serve th[e] illicit purpose" of extracting price concessions). See E.A. Farnsworth, Contracts § 7.17 (a), at 329 (1990) ("It is, therefore, bad faith to use discretion 'to recapture opportunities forgone on contracting' as determined by the other party's reasonable expectations — to refuse 'to pay the expected cost of performance,'" quoting Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369, 369, 372-373 [1980]).

Anthony's asks us to hold that, in contracts between sophisticated businesspeople, no covenant of good faith and fair dealing is implied. We decline so to hold. We note that Anthony's cites no authority to support its contention. Indeed, the rule is clear in Massachusetts that every contract is subject to an implied covenant of good faith and fair dealing. *Warner Ins. Co.* v. *Commissioner of Ins.*, *supra* at 362 n.9. *Kerrigan* v. *Boston*, *supra* at 33.

Anthony's further maintains that, because he did not find "bad faith," the judge erred in ruling that Anthony's violated the implied covenant of good faith and fair dealing. There was no error. An examination of the record suggests that the trial judge redacted the references to Anthony's bad faith in HBC's proposed findings of fact so that his findings of fact would be consistent with his decision to deny HBC's claim under G. L. c. 93A. The deletions thus read are not inconsis-

tent with the judge's determination that Anthony's violated the implied covenant of good faith and fair dealing.

6. *HBC's claim under G. L. c. 93A.* In its cross-appeal, HBC contends that the judge's ruling that Anthony's violated the covenant of good faith and fair dealing cannot be squared with his denial of HBC's claim under G. L. c. 93A. Anthony's agrees that the two rulings cannot be squared.[26] HBC contends that on the record before us, Anthony's conduct amounts to an "unfair or deceptive act or practice" as a matter of law and that, therefore, the judge erred in denying HBC's claim for damages under G. L. c. 93A. We agree.

General Laws c. 93A, § 2 (*a*) (1990 ed.), makes unlawful any "[u]nfair . . . acts or practices in the conduct of any trade or commerce." This prohibition is "extended to those engaged in trade or commerce in business transactions with others similarly engaged" by G. L. c. 93A, § 11. *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 779 (1986), citing *Manning* v. *Zuckerman*, 388 Mass. 8, 12 (1983). We have said that conduct "in disregard of known contractual arrangements" and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes. *Wang Laboratories, Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 857 (1986). See *Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 825 (1982) (if proved, submission of low bid followed by demand for more money after award of contract would constitute violations of c. 93A). See also *Pepsi-Cola Metropolitan Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 17-19 (1st Cir. 1985) (commercial extortion giving rise to c. 93A liability, and treble damages, where defendant withheld payment due under contract not because of dispute over liability or inability to pay but, rather, as " 'wedge' against [plaintiff] 'to enhance [defendant's] bargaining power for more product").

---

[26]Anthony's contends, however, that it is the judge's ruling that it violated the implied covenant of good faith and fair dealing that must be set aside. We do not agree. See section 5, *supra.*

Under G. L. c. 93A, § 11, HBC is entitled to multiple (not more than treble and not less than double) damages if Anthony's acted "knowingly" or "wilfully" in violation of § 2. "A judge need not make an *express* finding that a person wilfully or knowingly violated G. L. c. 93A, § 2, as long as the evidence warrants a finding of either" (emphasis in original). *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 578 n.13 (1986). Although the judge made no finding as to Anthony's knowledge or wilfulness, it is clear from the judge's findings of fact that Anthony's acted knowingly and wilfully. Anthony's knowing use of a pretext to coerce HBC into paying Anthony's more than the contract required establishes wilfulness as a matter of law. See section 5, *supra*; *Pepsi-Cola Metropolitan Bottling Co., Inc.* v. *Checkers, Inc.*, *supra* at 18 ("[T]he evidence is sufficient to support its determination that [the defendants] . . . were guilty of a willful violation of . . . c. 93A. The court was entitled to believe that [the defendants] . . . had withheld monies which they legally owed as a form of extortion — to force Pepsi to do what otherwise it could not be legally required to do"). Cf. *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, *supra* at 780 ("Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, 'willful' behavior under the statute"); *Service Publications, Inc.* v. *Goverman*, *supra* at 578 n.13; *Shaw* v. *Rodman Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 711 (1985); *Computer Sys. Eng'g, Inc.* v. *Qantel Corp.*, 740 F.2d 59, 68 (1st Cir. 1984). Anthony's attempt to force HBC to increase Anthony's compensation was a knowing and wilful violation of G. L. c. 93A, § 2, as a matter of law. See *Pepsi-Cola Metropolitan Bottling Co., Inc.* v. *Checkers, Inc.*, *supra* at 18.

We recognize that there may be "cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business." *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983). In such circumstances, a claimant would have to show greater "rascality" than would a less sophisticated

party. *Id.* Anthony's conduct, however, more than meets the standard of an "unfair or deceptive act or practice" — even taking into account that both parties to the transaction were sophisticated business people. See section 5, *supra.*

Anthony's replies, correctly, that the judge's determination that Anthony's did not engage in any unfair or deceptive act or practice is one of fact and therefore must stand unless clearly erroneous. The judge's extensive findings as to Anthony's violation of the implied covenant of good faith and fair dealing, however, established as a matter of both fact and law that Anthony's actions were unfair or deceptive. See section 5, *supra.* We therefore remand the action to the trial court for determination of reasonable attorney's fees[27] and for the awarding of damages pursuant to G. L. c. 93A, § 11.[28]

7. *Exclusion of evidence of postbreach events and the testimony of Anthony's proffered rebuttal expert.* Anthony's maintains that the judge erred in excluding evidence of events after May 29, 1987.[29] Anthony's contends that the excluded evidence demonstrates that the judge clearly was in error to rule that "HBC would have met the [o]utside

---

[27]In its complaint, HBC prayed for an award of attorneys' fees under G. L. c. 93A. As we explain in the text, this prayer should be allowed. HBC has made no separate request for an award of appellate attorneys' fees. In these circumstances, we conclude that, as a matter of discretion, we should not award appellate attorney's fees. See *Patry* v. *Liberty Mobilehome Sales, Inc.,* 394 Mass. 270, 272 (1985).

[28]The judge, of course, should not, in multiplying the damages, include that portion of the judgment that represents prejudgment interest. *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. 704, 716 (1990).

[29]The evidence that Anthony's sought to introduce was: BRA plans prepared in October, 1987, questioning the designs of the internal canal and the hotel; testimony that one of the nine major architectural firms working for HBC quit the project in October, 1987; a December, 1987, memorandum, prepared by an HBC employee after a public meeting, that lists a number of concerns the BRA had about the project; a construction schedule prepared in the summer of 1987 that shows a 1991 date for the beginning of construction; evidence that HBC attempted to redesign the entire project in the fall of 1987 by hiring a new architectural firm; and evidence that the previous architect had stopped work on the Fan Pier project sometime after May 29, 1987.

[c]losing [d]ate of December 31, 1988, . . . but for the May 29, 1987, disapproval letter." The judge ruled that the evidence proffered by Anthony's was relevant, if at all, only to collateral issues and would be needlessly cumulative.

Whether evidence is relevant is a question "addressed to the sound discretion of the trial judge." *Commonwealth* v. *Booker*, 386 Mass. 466, 469 (1982), citing *Commonwealth* v. *Chretien*, 383 Mass. 123, 135-136 (1981). See *Commonwealth* v. *Good*, 409 Mass. 612, 621 (1991). The issue "of relevancy is 'a matter on which the opinion of the trial judge will be accepted on review except for palpable error.' " *Booker*, *supra* at 470, quoting *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981). There was no error in the judge's ruling excluding evidence of postbreach events surrounding the Fan Pier development. The judge found that, but for the May 29, 1987, letter, HBC would have met the outside closing date. The judge reasonably could have concluded that postbreach events were substantially influenced, if not caused, by the disapproval letter. There was ample evidence to support the judge's conclusion that, but for Anthony's breach of contract, HBC could and would have been able to perform its obligations.

Anthony's also maintains that the judge erred in prohibiting its rebuttal expert from testifying that, given HBC's own scheduling assumptions, it could not have commenced construction of the hotel by the outside closing date. The rebuttal witness was called after fifty days of trial during which both parties had submitted voluminous evidence focused on the issue of HBC's ability or inability to meet the outside closing date. In these circumstances, "[a] trial judge has substantial discretion in determining whether to allow the presentation of rebuttal evidence." *Mason* v. *General Motors Corp.*, 397 Mass. 183, 193 (1986).

The judge found, by "overwhelming evidence," that, but for the May 29, 1987, letter, HBC would have met the outside closing date. We are not persuaded by Anthony's contention that had the judge heard the expert's testimony,

his factual findings and conclusion would have been different.[30]

8. *Damages issues.* The judge awarded HBC $42.6 million in expectancy damages. In the alternative, the judge ruled that HBC is entitled to $14,583,987.50 in reliance damages, representing HBC's reasonable expenditures in connection with the Fan Pier project and the lost interest on that money.[31]

A. *Measure of damages.* Anthony's argues that the judge used a mistaken measure of expectancy damages. According to Anthony's, the judge equated HBC's expectancy damages with the value of the land itself, failing to take into account the contract and the various risks and duties that it imposed. Anthony's is mistaken. The judge ruled "that HBC's expectancy damages can be measured by the value of its *interests* under the 1983 [a]greements as of May 29, 1987, the date of the breach . . ." (emphasis added). HBC's expert testified as to the value of HBC's rights under the agreements to develop the Fan Pier property, purchase the residential land, and lease the commercial real estate. The judge accepted the expert's methodology, but then discounted the expert's figures to take into account development risks and uncertainties.

---

[30]The judge heard a full offer of proof on the expected rebuttal testimony. The excluded evidence supported Anthony's claim that HBC could not meet the outside closing date. See *Drake* v. *Goodman,* 386 Mass. 88, 92 (1982) ("There is no right to present rebuttal evidence that only supports a party's affirmative case"). Assuming, without deciding, that the judge erred, Anthony's could not show that the proffered evidence would have altered the judge's determination. HBC offered abundant evidence, which the judge obviously found credible, that it would have met the outside closing date. Thus, Anthony's would not be able to show prejudice in this jury-waived trial. Cf. *Boston* v. *Board of Educ.,* 392 Mass. 788, 798 (1984) (excluded evidence contained nothing of assistance; court's conclusion and outcome of case would have been the same if evidence had been admitted).

[31]The judge also awarded HBC $2,388,850.15 (plus interest from the date of the filing of the original complaint) for reasonable postbreach expenditures incurred by HBC and $347,216 (plus interest), the sum he found Anthony's and other Athanas entities owed HBC for the cost of joint development activities.

There was no error in the judge's measure of expectancy damages.

Anthony's also argues that HBC was limited to seeking special damages (i.e., lost profits), and that the judge was therefore in error in awarding them general damages (i.e., fair market value of interests under agreements less compensation due to Anthony's). Anthony's corollary to this argument is that, because in this case lost profits are too speculative and too remote a measure of damages, HBC is entitled to zero expectancy damages. Anthony's relies on *American Mechanical Corp.* v. *Union Mach. Co. of Lynn, Inc.*, 21 Mass. App. Ct. 97, 102 (1985). That case does not assist its claim. In that case, the Appeals Court noted that "the aim in measuring damages in the event of a breach is to place the injured party in as good a position as he would have been in had the contract been performed." *Id.* at 101. As a result, the Appeals Court rejected a rigid formulaic approach to damages which would have undercompensated the plaintiff in that case.[32]

B. *Admission of expert testimony regarding comparably valued real estate was not erroneous.* Anthony's claims that the parcels of real estate used by HBC's expert as "comparables" are, as a matter of fact and law, not comparable to the Fan Pier property. The judge has broad discretion in accepting evidence on comparable values; his decision will be reversed only if manifestly erroneous. *Iris* v. *Hingham*, 303 Mass. 401, 408-409 (1939). *Fourth Nat'l Bank of Boston* v. *Commonwealth*, 212 Mass. 66, 68 (1912). Anthony's specific arguments regarding the purported dissimilarities between

---

[32]Many of Anthony's arguments on the damages issues reflect its fundamental disagreement with the judge's determination that HBC would have been able to perform its obligations under the agreements. Anthony's argues that HBC is not entitled to damages, as it could not meet the outside closing date. Because we have concluded that the judge's rulings on that issue were correct, we do not comment on these arguments.

the "comparables" and the Fan Pier property bear only on the weight of the evidence.[33]

Anthony's further asserts that the testimony of HBC's expert regarding the value of the "comparables" was based on inadmissible hearsay. Anthony's argues that it was error to allow the HBC expert to give his opinion based on the contents of recorded deeds because the contents of those deeds (square footage and sales prices) were not independently admissible, and, further, even if the contents were admissible, the expert should only have been allowed to state his opinion without the contents of those deeds being admitted in evidence.[34]

HBC's expert verified the information he obtained from the deeds by speaking with a party (or the party's counsel) to each of the comparable transactions. The direct testimony of these parties, had it been offered, would have been independently admissible. HBC was not required to "produc[e] exhibits and witnesses whose sole function is to construct a proper foundation for the expert's opinion." *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986).

Nor did the judge err in allowing HBC's expert to testify to the sale prices and square footage of comparable properties in order to explain the basis for his opinion of Fan Pier's value. "[W]hen, as here, an expert's statements concerning matters on which he has relied are admitted for the limited purpose of laying the foundation for his opinion and are presented to the jury [or judge] in a manner that avoids prejudice to the opposing party, the trial judge's discretion

---

[33]E.g., comparing land assemblage sales to single sales, see *Keating* v. *Duxbury Hous. Auth.*, 11 Mass. App. Ct. 934, 935 (1981); *R.H. White Realty Co., Inc.* v. *Boston Redevelopment Auth.*, 3 Mass. App. Ct. 505, 507-508 (1975); comparing sales in one location to sales in another, see *Lee* v. *Commonwealth*, 361 Mass. 864, 865 (1972); *Boyd* v. *Lawrence Redevelopment Auth.*, 348 Mass. 83, 85-86 (1964); comparing properties which differ in zoning, see *Gregori* v. *Springfield*, 348 Mass. 395, 397 (1965); *Lee, supra.*

[34]Witnesses with direct knowledge of the transactions testified as to the square footage and sale prices of ten of the "comparables." At a minimum, then, as to these witnesses, the testimony clearly was not hearsay.

should not be disturbed." *Simon* v. *Solomon*, 385 Mass. 91, 106 (1982). Anthony's did not dispute the accuracy of any of the comparable sales data. Nor does Anthony's dispute the qualifications of the expert, or that he can give an ultimate opinion on valuation. Even if it were error, we discern no prejudice on this record. The judge found that HBC's valuation expert "failed to make those adjustments which the Court is of the opinion should have been made to substantially reduce the price paid for the comparable sales in relation to the Fan Pier property. The judge accordingly concluded that the dissim'larities between the "comparables" and the Fan Pier property required that figure arrived at by HBC's expert be reduced by approximately sixty per cent.[35]

C. *Exclusion of the testimony of four of Anthony's witnesses.* Anthony's argues that the judge committed prejudicial error in excluding the testimony of four witnesses called to testify about the risks and uncertainties involved in the Fan Pier development. According to Anthony's, these experts would have opined that HBC's expectancy interest was zero, either because HBC could not meet the outside closing date, "no knowledgeable developer would pay anything for HBC's rights," or "it is not possible to determine with any reasonable certainty that HBC's interests had any value as of the date of the breach." The judge, following argument of counsel and a review of offers of proof and the witnesses' answers to interrogatories, excluded their testimony because, unlike

---

[35]*Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth.*, 335 Mass. 189 (1956), on which Anthony's relies, is not to the contrary. In *Newton Girl Scout*, the Massachusetts Turnpike Authority (authority) called an expert who did "not appear to have had special experience in determining the value of the type of camp property" involved in that case. *Id.* at 199. The authority's expert testified to the price for which a single property, adapted to an entirely different use, had been sold three years earlier. The president of the Girl Scouts who, unlike the authority's expert, was very knowledgeable about the camp property, was not permitted to give her opinion of the value of the property. In light of the authority's expert's lack of knowledge concerning camp property, as well as the exclusion of the Girl Scouts' expert, we said that the authority's expert testimony regarding a sole, allegedly "comparable" transaction was prejudicial to the Girl Scouts.

Anthony's two other expert witnesses who were real estate appraisers, they could not provide testimony that would be new and of assistance to the judge.[36] The judge told Anthony's that he wanted evidence on valuation, not on liability.[37] These witnesses would have relitigated liability issues. The judge reasonably could exclude that testimony.

Further, a judge has discretion to exclude expert testimony. *Nally* v. *Volkswagen of Am., Inc.*, 405 Mass. 191, 197 (1989). *Commonwealth* v. *Dockham*, 405 Mass. 618, 628 (1989). It is also within the discretion of the judge to exclude excessively cumulative evidence, including expert testimony. *Commonwealth* v. *Durning*, 406 Mass. 485, 497 (1990). *Commonwealth* v. *Wilson*, 381 Mass. 90, 116 (1980). *Commonwealth* v. *Ranahan*, 23 Mass. App. Ct. 201, 204 (1986). The judge did not err in excluding the testimony of Anthony's experts who were not expert in valuing real estate transactions.

D. *Award of damages.* Anthony's argues that the judge's damages award "is merely plucked from the air, and rests upon no evidentiary foundation." Anthony's claims that the judge "thoroughly rejected" the analysis of HBC's valuation expert, and that his damages award perforce has no basis. In fact, the judge rejected only the expert's final figures, not his method. He found that, "[a]lthough the adjustment process used by [HBC's expert] represents standard appraisal methodology when valuing land by the comparable sales method, [the expert] failed to make those adjustments which the Court is of the opinion should have been made to substan-

---

[36]The judge already had determined in the phase I trial that, as a matter of law, but for Anthony's breach, HBC would have obtained all necessary permits and approvals and met the outside closing date. See *supra* at 477. He accordingly sought testimony regarding the value of HBC's interests (factoring in all the risks and uncertainties) rather than testimony which sought to reopen an issue already litigated.

[37]Anthony's position was that there was no liability because HBC could not meet the outside closing date and hence no damages. Anthony's had ample opportunity to offer evidence on valuation while preserving the liability issues for appeal. It chose not to do so.

tially reduce the price paid for the comparable sales in rela-
tion to the Fan Pier property."

"Valuation is a question of fact, and we will not disturb a
judge's determination unless it is clearly erroneous." *Sarrouf
v. New England Patriots Football Club, Inc.*, 397 Mass. 542,
550 (1986). Here, the judge's damages award fell within the
range of value opinions testified to at trial. See *General Dy-
namics Corp. v. Assessors of Quincy*, 388 Mass. 24, 35-36
(1983). Anthony's has not met its burden of showing that the
damages award is clearly erroneous. See *First Pa. Mortgage
Trust v. Dorchester Sav. Bank*, 395 Mass. 614, 621 (1985);
*Delano Growers' Coop. Winery v. Supreme Wine Co.*, 393
Mass. 666, 681-683 (1985).

We do not agree that the judge's damages award lacks an
evidentiary foundation. HBC offered substantial evidence as
to its damages. The judge heard twelve witnesses during
twenty-seven days of trial and reviewed 169 exhibits and
forty-five documents. His findings of facts are recorded in
270 numbered paragraphs. The judge complied with his duty
of "articulat[ing] the essential grounds of his decision,"
*Schrottman v. Barnicle*, 386 Mass. 627, 638 (1982); he is
not required to itemize every component of that decision.
*New Boston Garden Corp. v. Assessors of Boston*, 383 Mass.
456, 472 (1981).

E. *Alleged mathematical error in calculating the damages
award.* Anthony's claims that, in calculating HBC's damages
award, the judge made a mathematical error. HBC's expert
opined as to the value of both HBC's interests in Fan Pier
and Anthony's projected compensation under the agree-
ments. The judge rejected both of these figures as too high,
and substituted his own figures. He arrived at his damages
award by subtracting the compensation due Anthony's from
the value of HBC's interests. According to Anthony's, how-
ever, while the judge was free to discount the value of HBC's
interests, he was barred from similarly discounting
Anthony's projected compensation. The latter figure, argues
Anthony's, is a constant. We disagree.

Anthony's compensation under the agreements has several components: the contract price to be paid for the residential land, inflated by 100% of the Consumer Price Index (CPI) increase between July, 1983, and the date of closing; ten per cent of HBC's share of net sales and rental profits generated from development of the residential land; basic rent for the hotel lease plus a two-stage escalation rent; and basic rent for the commercial and marina leases plus escalation rent. There are many uncertain variables involved in this compensation package: how many acres HBC ultimately would buy and develop, the CPI, inflation, and HBC's sales and profits, to name just a few. The judge found that HBC's expert, in assessing the present value of Anthony's compensation under the agreements, used formulas and variables designed to maximize projected payments to Anthony's.[38] In discounting HBC's expert's valuation of HBC's interests, the judge was free concomitantly to discount the expert's valuation of Anthony's compensation.[39]

F. *Postbreach expenditures.* The judge awarded HBC "as damages reasonable postbreach expenditures of $2,388,850.15." Of this amount, $1,249,843.09 represents "reasonable postbreach expenses incurred in an effort to mitigate damages." The other $1,139,007.06 of the award represents money paid to Anthony's as rent and taxes. We reverse the first award, and affirm the second.

As for the $1,249,843.09, Anthony's argues that HBC is not entitled to these postbreach expenditures because HBC did not meet its burden of proving that they were reasonably incurred in an effort to mitigate its losses. We agree. "Dam-

---

[38]E.g., HBC's valuation expert assumed that escalation rent would be paid to Anthony's annually and not deferred, as it might have been.

[39]Finally, Anthony's argues that HBC is not entitled to reliance damages because it failed to prove that its expenditures were reasonable. If HBC is entitled to reliance damages, Anthony's argues, it is not entitled to recover expenditures made before the contract was signed, interest on prebreach expenditures, or postbreach expenditures. Because the judge awarded reliance damages merely as an alternative to expectancy damages, and because we affirm the expectancy damages, we do not address these arguments.

ages are recoverable for special losses incurred in a reasonable effort, whether successful or not, to avoid harm that the defendant had reason to foresee as a probable result of his breach when the contract was made." Restatement, Contracts, § 336 (2). See, e.g., *John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 25 (1911). However, "[t]he plaintiff, having the burden of proof, must of course show that the expenses incurred were reasonable." *Automated Donut Syss., Inc. v. Consolidated Rail Corp.*, 12 Mass. App. Ct. 326, 335 (1981). Accord, *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963) ("The critical factor in determining a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable in the circumstances existing at the time"). During the damages phase of the trial HBC offered no evidence that any of its expenditures were reasonably incurred in an effort to mitigate its losses. Accordingly, the award of $1,249,843.09 is reversed.

The award to HBC for its postbreach payment to Anthony's of rent and taxes appears to be based on a theory of restitution. In calculating the amount of the expectancy damages, the judge valued HBC's rights under the agreements as of the date of the breach. He arrived at this value by subtracting the consideration due to Anthony's from the fair rental value of the commercial land (in each year of the leases) and from the fair market value of the residential land.[40] The judge similarly calculated the consideration due to Anthony's from the date of the breach. The amount of the postbreach rent and tax payments was included in this figure.

---

[40]In order to value HBC's leasehold interests the judge, for "each year of the lease, . . . deduct[ed] . . . from the fair rental value the consideration owed to Anthony's" under the agreements. He then totalled this value, discounted it to its present value, and arrived at a total of $36 million. Similarly, in valuing HBC's option rights in the residential land, the judge calculated "the fair market value of the residential land less the value of the consideration due to Anthony's on the purchase of the residential land" under the agreements. After discounting to present value, he arrived at a figure of $6.6 million. The total of the two figures, $42.6 million, is the amount of the expectancy damages award.

In order to avoid counting this figure twice in Anthony's favor, the judge concluded that the postbreach rent and tax payments had to be returned to HBC. This amount, along with all other consideration due to Anthony's, was then subtracted from the gross value of HBC's rights under the agreements to arrive at HBC's net expectancy. Because the judge had subtracted the postbreach rent and tax payments from the amount he determined HBC was owed as expectancy damages, he correctly ordered the amount of those actual payments to be returned to HBC in the award. On remand, however, this portion of the award should be excluded from the damages considered under G. L. c. 93A because it is in the nature of restitution and not damages.

9. *Joint liability.* In 1984, HBC hired environmental consultants. HBC and Anthony's entered into an agreement to share the environmental consultants' work and fees. During the phase I trial, HBC and Anthony's stipulated that Anthony's had not reimbursed HBC for its share of the fees. The judge entered judgment against Boston Mariner, Inc., Pier Four, Inc., and Anthony's Hawthorne, Inc., jointly and severally with Anthony's, for their share of the environmental consulting fees incurred in connection with the Fan Pier and Pier Four projects. Boston Mariner, Pier Four, Inc., and Anthony's Hawthorne argue that, because only Anthony's was a party to the stipulation, only Anthony's should be held liable.

There was substantial evidence from which the judge could reasonably find that Boston Mariner, Pier Four, Inc., and Anthony's Hawthorne were all parties to the agreement regarding the environmental consultants' fees. The stipulation does not state that Anthony's was the only Athanas entity which was a party to the agreement regarding the environmental consultants' fees. Indeed, Anthony's counsel informed the judge that the stipulation was "very limited" and "not that detailed." The work done by the environmental consultants benefited both the Fan Pier and Pier Four projects. By implication, then, it also benefited Pier Four, Inc., and Anthony's Hawthorne, Inc., entities with an ownership inter-

est in Pier Four, as well as the Athanas family's development company, Boston Mariner. There was no error.

10. *Conveyance to Fan Yards Nominee Trust.* On January 19, 1988, the same day that the parties brought suit against each other, Anthony's recorded a deed transferring record title in Fan Pier to the Fan Yards Nominee Trust, the trustees of which are Athanas's four sons. In response, HBC amended its complaint to add the Fan Yards parties as defendants and to allege (1) the facts of the transfer of the land; and (2) that either the transfer of the Fan Pier property was invalid or that the transferees were bound by the obligations of the original 1983 agreements, including liability for breaches by Anthony's.

At the conclusion of the phase I trial on liability, the judge issued an interlocutory order enjoining Anthony's and the Fan Yards parties, among others, from conveying, leasing or otherwise alienating the Fan Pier property. Just before the phase II trial on damages began, HBC sought to raise the issue of the validity of the conveyance of the Fan Pier property to the Fan Yards Nominee Trust. The judge noted that it was possible he might find no damages, in which case the conveyance issue would be moot, and said, "I would rather not accept anything in reference to collection or anything else or judgment."

At the conclusion of the damages trial, the judge granted HBC's motion to enter partial final judgment under Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), instead of a final judgment, in order to leave open for future determination HBC's claims concerning collection on the judgment. Anthony's now seeks entry of a final judgment solely against Anthony's Pier Four, Inc., and HBC seeks entry of a final judgment jointly and severally against Anthony's and the Fan Yards parties. We reject each party's request.

The judge did not abuse his discretion in reserving the issues regarding the conveyances and the collection for the judgment. See *Dattoli* v. *Hale Hosp.*, 400 Mass. 175, 176 (1987). We affirm his partial final judgment under Mass. R. Civ. P. 54 (b). The factual record is insufficient for us to

enter a final judgment. Unlike the case cited by HBC as authority for the proposition that we, rather than the trial judge, may enter a final judgment, the evidence on the issue of collection of the judgment has not been heard by the judge and is not before us on this appeal. Cf. *Weinstein* v. *Miller*, 249 Mass. 516, 520 (1929). It is for the trial judge, after hearing, to enter the final judgment. This matter is remanded to the trial judge for determination whether the Fan Pier parties are jointly and severally liable to HBC and other issues concerning the collection of the judgment.

11. *Summary.* We affirm so much of the partial final judgment as awarded expectancy damages, postbreach rent and taxes paid by HBC to Anthony's, and consultants' fees. We set aside the award of postbreach expenditures not attributable to rent or taxes. We reverse so much of the judgment as denied G. L. c. 93A damages to HBC. We remand the matter to the trial judge for further proceedings consistent with this opinion.

*So ordered.*